# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45796-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| CLIFFORD MELVIN PORTER, JR., | |
| Appellant. | |

BJORGEN, C.J. — Clifford Melvin Porter, Jr. appeals his conviction for possession of a stolen motor vehicle. He argues that his counsel was ineffective because he failed to object to evidence inculpating him in other uncharged acts of theft. He also requests that this court exercise its discretion to refrain from imposing appellate costs if the State prevails.

We hold that Porter did not receive ineffective assistance of counsel, because he has not shown the absence of any legitimate strategic or tactical reason for his attorney's failure to object. Further, because Porter is indigent, we exercise our discretion to not impose appellate costs.

Accordingly, we affirm.

## FACTS

### I. UNDERLYING FACTS

Jesse Longoria owned a Pontiac Firebird, which was stored on the driveway of property jointly owned with his ex-wife, Sally Lockard. After returning from a trip, Longoria found that the Firebird had been stolen. He also found that the house had been broken into and numerous other items were stolen, including a television. On August 27, 2011, a neighbor called Lockard

and notified her that he knew Porter and that the Firebird was in a "chop shop" located on 224th Steet in Pierce County. Report of Proceedings (RP) at 117-118. Lockard and Longoria reported this information to authorities.

That same day, Darren Witt, a detective with the Pierce County Sheriff's Department, and Kevin Reding, a Pierce County deputy sheriff, went to the 224th Street property. They contacted Mareta Rodocker, Porter's girlfriend, and asked if she would get the owner of the property. Rodocker returned with Porter. The officers told Porter that they believed there was a stolen vehicle in the garage located on the property. Porter denied this allegation and invited them to look inside the garage.

Upon reaching the garage, the officers discovered a combination lock on its door. Porter stated that they could look in the garage, but that he could not open it because the combination lock belonged to his father.[1] The officers allowed Porter to call his father to obtain the lock's combination. Porter, unable to contact his father via phone, left the property "to go seek out where [he] was." RP at 296-97. After the officers realized Porter had left, they secured the property and applied for a warrant to search the garage.

Upon receiving the warrant, a third officer, Nicholas Hausner, arrived to help execute it. The three officers searched the garage and discovered the following: a Pontiac Firebird sawed in half that matched the vehicle identification number of Longoria's Firebird, a television that had been stolen from Longoria's home, and an R&R Recycling receipt that bore a photocopy of Porter's identification card on it and showed him as the seller of various scrap metals.

---

[1] Porter's father's name is Clifford Porter, Sr. To avoid confusion, we refer to him in this opinion as Porter's father.

2

## II. PROCEDURE

Based on this evidence, Porter was charged with unlawful possession of a stolen vehicle.[2] The State declined to charge him for possessing the television because Porter represented that he had a receipt for it. At trial, however, the television was mentioned several times through the testimony of several witnesses without objection from defense counsel.

1.      Television Evidence

Witt testified that he found a television in the garage, that he photographed it, and that he returned it to Longoria. Hausner identified a photograph of the television found in the garage, which was admitted into evidence. On redirect examination of Longoria, the State showed the picture of the television to the jury and elicited various details about the television, including that it was from Longoria's living room, when it was purchased, what type of television it was, and where it was located in the garage.

During Longoria's testimony, the trial court held a sidebar and expressed concern about the State eliciting details about the television because Porter was never charged with stealing it. Defense counsel stated that he would have objected during Longoria's testimony regarding the television if it went beyond his "say-so," but decided not to object because "[t]here's no documentation that he's showing us with respect to a bill of sale, a receipt, a serial number, nothing." RP at 197. In response, the trial court stated that it expressed concern because it "didn't feel that the television was relevant." RP at 197.

---

[2] RCW 9A.56.068.

No. 45796-2-II

In the State's closing argument, the prosecutor referred to the stolen television on two occasions. In discussing the value of circumstantial evidence, he stated, "[No] one laid eyes on the defendant . . . touching . . . the stolen television." RP at 342. In the State's rebuttal, the prosecutor opined:

> It is interesting that whoever took this Firebird also took a TV from inside the residence, and that they both ended up inside the garage at Mr. Porter Junior's property, and that they're both found in the same garage with this receipt that has his [identification] copied onto it. It's pretty interesting stuff.

RP at 380-81.

2.     Evidence of Burglary and Other Stolen Items

In addition, evidence related to other items stolen from Longoria and Lockard's home was elicited without objection from defense counsel. During Longoria's cross-examination, defense counsel asked whether he remembered anything stolen from his home other than the Firebird. Longoria replied, "The gate, everything that was metal out of the house, pellet stove, washer, dryer, all the cords from all the appliances had been cut off evidently for the copper in them, from what I understand." RP at 193. Further, Lockhard testified that at their residence she discovered "[t]he front door broke in, the washer, dryer, pellet stove, wood stove, dark wood set [missing] and the house trashed." RP at 119.

3.     Porter's Defense Theory

Defense counsel presented a theory that Porter lacked access to the garage and that someone else was likely to blame for the stolen Firebird and other items. Defense counsel cross-examined the State's witnesses and presented its own witnesses, who suggested that Porter did not live at the 224th Street property and that several others lived and visited it. Porter himself testified and defense counsel elicited that he did not live on the 224th Street property and had not

4

accessed the garage for several months. Porter stated that he did not place the combination lock on the garage and that it belonged to his father. He testified that he was "shocked" when he learned that the Pontiac Firebird was in the garage and had "not a clue" how it got in there. RP at 303.

In closing argument, defense counsel attempted to assign blame to others for the stolen Firebird and other stolen items, placing particular emphasis on Longoria and Lockard's neighbor as a prime suspect:

> All sorts of people seem to come and go for nobody knows what reason. Maybe just visiting, maybe just dropping by, we really don't know, but all sorts of people who might have relevant information, nobody hangs around. *And that includes the neighbor of Ms. Lockard who knows exactly where this car is by street address. I mean, that's why they went to that address. So where the heck is this guy? And what does he really know? And how come nobody, like the authorities, we are going to get a warrant. Let's go talk to this man, seeing as that information came that very day.*

RP at 371-72 (emphasis added). At one point, defense counsel brought up the television to further inculpate the neighbor:

> According to Ms. Lockard, a neighbor is basically watching over the place. That's what you do with neighbors. We're going to be gone for a while, just take a look every once in a while.
> Well, this becomes suspicious if you think about the evidence. Whoever this neighbor is, under his watch, the house right next door, a 14-foot steel and chain link cattle gate is stolen and removed. The house is either kicked in or broken in, and major things that weigh a lot are taken -- stove, washer, dryer, television -- . . . .
> . . . .
> She talks to the neighbor. Do you know what happened? And what we know from the evidence, without speculation, he's able to give her the exact location where this car is. Not speculation. Somebody came -- he's able, out of all of the addresses in Pierce County, I can tell you exactly where it is.
> Doesn't that raise a thought in your mind that there's some criminal activity going on, and isn't that the most logical person to follow up with? How do you know that? Of all the places in the county, how did you come up with that

5

> address, unless you know a lot, and maybe we should sit down and talk with this person.
>      Is that person before you? No. We have no idea where that person is. Nobody seems to know where that person is.

RP at 361-62.

4.      Post-Trial

The jury found Porter guilty of unlawfully possessing a stolen motor vehicle. Porter appealed. We reversed Porter's conviction in *State v. Porter*, noted at 188 Wn. App. 1051, 2015 WL 4252605, holding that the charging document was insufficient. The Supreme Court disagreed and reinstated his conviction in *State v. Porter*, 186 Wn.2d 85, 375 P.3d 664 (2016).

The State filed a cost bill with the Supreme Court requesting a total award of $7,083.07 for discretionary appellate costs including: $5,689.00 for attorney fees, $1,320.60 for preparation of the report of proceedings, $55.97 for copies of briefs, and $27.50 for copies of clerk's papers. Porter objected, and the Supreme Court denied the State's request for an award as premature. Porter moved our court to exercise its discretion on the issue of appellate costs in its decision terminating review, which motion we granted.

In accordance with the Supreme Court's remand instruction, *Porter*, 186 Wn.2d at 94, we address whether Porter received ineffective assistance of counsel based on defense counsel's failure to object to the evidence relating to the television and other stolen items. We also consider whether to grant or waive the State's requested appellate costs.

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

1.    Legal Principles

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance of counsel claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). If a defendant fails to establish either prong, we need not inquire further. *State v. Hendrickson,* 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

The law affords trial counsel wide latitude in the choice of tactics, and we begin with a strong presumption that counsel's representation was effective. *Grier*, 171 Wn.2d at 33; *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 733, 16 P.3d 1 (2001). Representation is deficient if after considering all the circumstances, it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. To demonstrate deficient performance the defendant must show that, based on the record, there were no legitimate strategic or tactical reasons for the challenged conduct. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed. *Grier*, 171 Wn.2d at 34.

In applying these standards, we recognize that "[t]he decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Therefore, we presume "that the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*,

143 Wn. App. 1, 20, 177 P.3d 1127 (2007). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763.

2.      Deficiency

Porter argues that his counsel was deficient for failing to object or move in limine to exclude evidence of the television and other stolen items. We disagree.

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence is admissible for a proper purpose if a four-part test is satisfied. Specifically,

> a trial judge must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

*State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014) (quotation marks omitted). Proper purposes include matters such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

Porter was not charged for the stolen television, for burglarizing Longoria and Lockard's home, or for otherwise stealing any other items from that home, yet this evidence was before the jury by way of several witnesses' testimony. Further, a picture of the television was shown to the jury, and the State implied in its closing argument that Porter stole the television out of Longoria's home. Evidence of Porter's other criminal acts made up a sizable piece of the State's case on a charge only for unlawful possession of a stolen vehicle.

Although defense counsel never moved in limine or objected to this evidence to trigger an ER 404(b) analysis, the trial court called a sidebar, sua sponte, and explained that it did not

think the television evidence was likely relevant to prove Porter's charge of possession of a stolen motor vehicle. Thus, it is likely that the trial court would have sustained objections from defense counsel to this ER 404(b) evidence.

Even if such evidence were inadmissible, the State contends that defense counsel chose not to object to its admission because it was irrelevant to Porter's defense theory, which was a general denial. Indeed, Porter's defense can be characterized as an attempt to disassociate himself with the burglary of Lockard and Longoria's home and stolen items found in the garage, including the Firebird and television. Porter testified that he did not know the combination for the lock and that he assumed anything in there belonged to his father. He was "shocked" that the Firebird was in the garage and had "not a clue" how it got in there. RP at 303. Defense counsel argued Porter's denial in closing and tried to pinpoint blame on Lockard and Longoria's neighbor, who personally knew Porter and knew the stolen items were located on the 224th Street property. Defense counsel even utilized the stolen television to emphasize his theory, which further supports that his tactic was likely an attempt to assign blame to the neighbor.

In addition, in response to the trial court's concerns about the television evidence, defense counsel stated that he decided not to object because it was only Longoria's "say-so." RP at 197. Porter argues that this demonstrates defense counsel's deficiency, contending that any reasonable attorney would have objected to the evidence, given the trial court's hint that it may have sustained an objection. However, defense counsel's statement can be equally taken as asserting that it considered the television evidence, but found it did not rise to the level of impropriety necessary for an objection as it did not impede his theory of general denial. In

9

addition, defense counsel could reasonably have thought that objecting to evidence of the television and other stolen goods would seem inconsistent with his theory of general denial.

Given these considerations, Porter has not met his burden to show the absence of any legitimate strategic or tactical reasons for defense counsel's failure to object. *Emery*, 174 Wn.2d at 755. Therefore, Porter fails to show that his defense counsel's representation fell below an objective standard of reasonableness. Because Porter fails to demonstrate a deficiency, we need not reach whether admission of the ER 404(b) evidence caused prejudice. *Hendrickson,* 129 Wn.2d at 78. With that, his ineffective assistant of counsel claim fails.

## II. APPELLATE COSTS

Porter argues in his supplemental brief that if the State substantially prevails in this appeal, we should decline to award the requested appellate costs. Under RCW 10.73.160(1), we possess broad discretion whether to grant or deny appellate costs to the prevailing party. *State v. Nolan*, 141 Wn.2d 620, 628, 8 P.3d 300 (2000); *State v. Sinclair*, 192 Wn. App. 380, 388, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016). Ability to pay is an important factor in the exercise of that discretion, although it is not the only relevant factor. *Sinclair*, 192 Wn. App. at 389.

Porter was declared indigent for purposes of this appeal, and no party argues that evidence has been offered to the trial court to rebut the presumption of continued indigency under RAP 15.2(f). Following *State v. Grant*, 192 Wn. App. 1067, ¶13-16, 385 P.2d 184 (2016), we exercise our discretion to deny the State's request for discretionary appellate costs in these circumstances.

No. 45796-2-II

Porter also asserts that the imposition of appellate costs without first considering one's ability to pay may violate substantive due process. However, we "adhere to the fundamental principle that if a case can be decided on nonconstitutional grounds, an appellate court should refrain from deciding constitutional issues." *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 752, 49 P.3d 867 (2002). Because we decline to impose appellate costs on Porter under RCW 10.73.160(1), we need not consider whether appellate costs may violate substantive due process.

CONCLUSION

We affirm Porter's conviction and waive appellate costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, C.J.

BJORGEN, J.

I concur:

SUTTON, J.

11

MELNICK, J. (dissent in part) — I concur with the majority's decision on ineffective assistance of counsel but disagree with its ruling to waive appellate costs.[3]  For that reason, I dissent.

We have discretion to order appellate costs and we must exercise that discretion based on the facts and circumstances of each case.  In *State v. Nolan*, 141 Wn.2d 620, 626, 8 P.3d 300 (2000), the court clearly stated that RAP 14.2 provides appellate courts with great latitude in determining if appellate costs should be imposed.  The Court of Appeals has followed this precedent.  *State v. Sinclair*, 192 Wn. App. 380, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016).

Likewise, RCW 10.73.160(1) gives courts discretion on whether or not to impose appellate costs.  A defendant may petition the sentencing court at any time for the remission of costs if the amount due "will impose manifest hardship on the defendant or the defendant's immediate family." RCW 10.73.160(4).  The consideration of a defendant's ability to pay is an important factor in determining how we exercise discretion.  *Sinclair*, 192 Wn. App. at 389.

The majority relies on the "presumption of continued indigency" in RAP 15.2(f) to waive appellate costs.  Majority at 10.  I first note that an appellant is indigent under the rule if, because of poverty, he or she cannot "pay for all or some of the expenses for appellate review."  RAP 15.2(b)(1) & (c)(2).  This rule recognizes that there is a distinction between constitutional indigency and indigency.  *State v. Johnson*, 179 Wn.2d 534, 552–55, 315 P.3d 1090, *cert. denied*,

---

[3] The State has neither responded to Clifford Porter's supplemental brief on appellate costs nor requested appellate costs.

135 S. Ct. 139, 190 L. Ed. 2d 105 (2014). We are dealing with the latter in this case. An appellant who is not able to pay for some of the appellate costs may or may not be constitutionally indigent.

Next, the presumption relied on by the majority is rebuttable.[4] To determine if the presumption has been rebutted, I look at the facts and circumstances of this case. At sentencing, the court found that Porter had the ability or likely future ability to pay costs. Porter did not argue he could not pay discretionary costs and he did not ask to have them waived. Rather, he asked that they be reduced to $1,000. Porter received a 45 day sentence on electronic home monitoring. He was 43 years old and a few credits shy of getting his high school diploma. Porter has worked in auto body repair most of his life. At the time of sentencing, he worked part time for a towing company.

Based on the totality of the circumstances, I would exercise my discretion and not waive appellate costs.

_____
Melnick, J.

---

[4] 5 Karl B. Tegland, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE § 301.8, at 313 (6th ed. 2016), contains a discussion of presumptions in Washington.